GATEWAY COAL CO. *v.* UNITED MINE WORKERS
OF AMERICA ET AL.

No. 72–782.   Argued October 15, 1973—Decided January 8, 1974

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, Marshall, Blackmun, and Rehnquist, JJ., joined. Douglas, J., filed a dissenting opinion, *post*, p. 388.

*Leonard L. Scheinholtz* argued the cause for petitioner. With him on the briefs were *Henry J. Wallace, Jr.,* and *Daniel R. Minnick.*

*Joseph A. Yablonski* argued the cause for respondents. With him on the brief were *Clarice R. Feldman* and *Daniel B. Edelman.**

---

*Briefs of *amici curiae* urging reversal were filed by *Milton A. Smith* and *Lawrence M. Cohen* for the Chamber of Commerce of the United States; by *Guy Farmer* for the Bituminous Coal Oper-

MR. JUSTICE POWELL delivered the opinion of the Court.

This case involves a labor dispute over safety conditions between Gateway Coal Co. and United Mine Workers of America. The questions presented are of considerable importance to the development of federal policy regarding arbitration of safety disputes and enforcement of a contractual duty not to strike.

I

Gateway Coal Co. (the company) owns and operates a large underground coal mine known as the Gateway Mine, in Greene County, Pennsylvania. Some 550 production and maintenance workers, employed by the company, are represented for purposes of collective bargaining by United Mine Workers of America (the union), including its administrative division, District No. 4, and Local No. 6330.

On the morning of April 15, 1971, shortly before the daylight shift at the mine reported for work, a shuttle car operator on the departing midnight shift noticed an unusually low airflow in his section of the mine. His foreman made an anemometer check and discovered an airflow of only 11,000 cubic feet per minute, less than half the normal rate of 28,000 cubic feet per minute.[1]

ators' Assn., Inc.; and by *Richard D. Godown* and *Myron G. Hill, Jr.,* for the National Association of Manufacturers.

*J. Albert Woll, Laurence Gold, Thomas E. Harris, Stephen I. Schlossberg,* and *George Kaufmann* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al. as *amici curiae* urging affirmance.

[1] While this reduced airflow undoubtedly increased the accumulation of coal dust and flammable gas in the mine, it still exceeded the state ventilation requirement of 6,000 cubic feet per minute, Pa. Bituminous Coal Mine Act, Pub. L. 659 (1961), Pa. Stat. Ann., Tit. 52, § 701–242 (b) (1966), and the federal requirement of 9,000 cubic

The company evacuated the men from the mine and ordered the day-shift employees to stand by on the surface. An ensuing investigation revealed that the collapse of a ventilation structure had partially blocked an intake airway. Immediate repairs restored normal airflow, and underground mining operations resumed. In the meantime, however, some 100 of the 226 day-shift employees had disregarded the company's instructions to stand by and had gone home.

The following morning the union requested reporting pay for those employees who did not stand by as ordered on April 15, but the company refused. The union rejected the company's offer to arbitrate this dispute, and the miners on all three shifts walked off the job.

On April 17, pursuant to a union request, state and federal inspectors visited the mine to determine the adequacy of the repairs. The investigation revealed that, although collapse of the ventilation structure apparently occurred between 4 and 4:30 on the morning of April 15, records of the anemometer checks purportedly made by three foremen sometime between 5 a. m. and 8 a. m. disclosed no reduction in airflow.[2] The state inspector impounded the book of entries and notified the company that he would press criminal charges against the three foremen for falsification of the records. The company immediately suspended two of the men but decided against suspension of the third because he had reported the trouble.

On Sunday, April 18, about 200 company miners attended a special union meeting and voted not to work unless the company suspended all three foremen. The

_____

feet per minute, Federal Coal Mine Health and Safety Act of 1969, § 303 (b), 83 Stat. 767, 30 U. S. C. § 863 (b).

[2] Section 303 (d) (1) of the Federal Coal Mine Health and Safety Act of 1969, 30 U. S. C. § 863 (d) (1), requires such inspections within three hours immediately prior to the beginning of any shift.

company acquiesced in this demand, and the following Monday the miners returned to work. Criminal prosecutions were instituted against the three foremen, and the Pennsylvania Department of Environmental Resources undertook consideration of possible decertification proceedings against them.

On May 29, while the criminal charges were still pending, the company received word from the Department that it was at liberty to return the three foremen to work if it so desired.[3] One of the three had retired during his suspension, but the company reinstated the other two and scheduled them to resume work on the midnight shift on June 1. On that date, miners on all three shifts struck to protest the alleged safety hazard created by the presence of the two foremen in the mines. On June 8, the company formally offered to arbitrate this dispute, but the union refused. Subsequently, the two foremen pleaded *nolo contendere* to the criminal charges for falsification of the records and paid fines of $200 each.

Faced with a continuing strike and a refusal to arbitrate, the company invoked the jurisdiction of the District Court under § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185. It argued that the broad arbitration clause of the collective-bargaining agreement governed this dispute and requested an injunction against continuance of the strike. In a temporary restraining order later converted into a preliminary injunction, the District Court required the union to end the strike and to submit the dispute to an

---

[3] After its investigation, the Department concluded that:

"In view of the satisfactory record and good performance of these foreman [*sic*] in the past and the pending legal action, we feel that no further action should be taken in this matter. The coal company is at liberty to return the three (3) assistant foreman [*sic*] to work if it so desires." App. 16a–17a.

impartial umpire without delay.[4]   The order further provided for suspension of the two foremen pending the umpire's decision and prospectively required both parties to abide by his resolution of the controversy.

On appeal, the Court of Appeals for the Third Circuit, with one judge dissenting, reversed the judgment of the District Court and vacated the preliminary injunction.[5] 466 F. 2d 1157 (1972).   The court intimated that a special provision of the collective-bargaining agreement involved here might be construed to remove safety disputes from the coverage of the general arbitration clause and reasoned that, in any event, the usual federal policy favoring arbitration of labor relations disputes did not apply to questions concerning safety.   *Id.*, at 1159–1160. Relying in part on § 502 of the Labor Management Relations Act, 29 U. S. C. § 143, the court found that there was a public policy disfavoring compulsory arbitration of safety disputes.   Since it was "neither particularly stated nor unambiguously agreed in the labor contract that the parties shall submit mine safety disputes to binding arbitration," the Court of Appeals concluded that the union had no contractual duty to submit this controversy to arbitration and hence no implied obligation not to strike.   466 F. 2d, at 1159. Perceiving no wrong to enjoin, the court found it unnecessary to consider whether injunctive relief in this case was appropriate under the traditional considerations of equity set forth by this Court in *Boys Markets, Inc.* v.

---

[4] The District Court found that the present work stoppage was occasioned by a safety dispute over the reinstatement of the suspended foremen rather than by an economic dispute over reporting pay for April 15.

[5] While the appeal was pending and prior to the Court of Appeals' decision, the impartial umpire rendered his decision in favor of the company and determined; *inter alia*, that the two foremen should be permitted to return to work.   466 F. 2d 1157, 1159.

*Retail Clerks Union,* 398 U. S. 235 (1970). We granted certiorari, 410 U. S. 953 (1973).

This case presents three questions. First, did the collective-bargaining agreement then in force between these parties impose on them a compulsory duty to submit safety disputes to arbitration by an impartial umpire? Second, if so, did that duty to arbitrate give rise to an implied no-strike obligation supporting issuance of a *Boys Markets* injunction? Third, did the circumstances of this case satisfy the traditional equitable considerations controlling the availability of injunctive relief? We answer all three questions in the affirmative and accordingly reverse the judgment below.

## II

No obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so. At all times material to this case, the parties were bound by the National Bituminous Coal Wage Agreement of 1968 (the agreement). The section of the agreement entitled "Settlement of Local and District Disputes" [6] provides for resolution of grievances by

---

[6] This section provides, in relevant part:

"Should differences arise between the Mine Workers and the operators as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences immediately: (The parties will not be represented by legal counsel at any of the steps below.)

"1. Between the aggrieved party and the mine management.

"2. Through the management of the mine and the mine committee.

"3. Through district representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company.

"4. By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the operators. Neither

direct negotiation between the parties and ultimately, should such negotiations fail, for arbitration by an impartial umpire "mutually agreed upon by the operator or operators affected and . . . the United Mine Workers of America." The section further states that the "decision of the umpire shall be final." This arbitration clause governs disputes "as to the meaning and application of the provisions of this agreement," disputes "about matters not specifically mentioned in this agreement," and "any local trouble of any kind aris[ing] at the mine." Paragraph 3 of the "Miscellaneous" section of the agreement [7] states that both parties "agree and

the Mine Workers' representatives on the board nor the operators' representatives on the board shall be the same persons who participated in steps (1), (2), or (3) of this procedure.

"5. Should the board fail to agree the matter shall, within twenty (20) days after decision by the board, be referred to an umpire to be mutually agreed upon by the operator or operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and salary incident to the services of an umpire shall be paid equally by the operator or operators affected and by the Mine Workers.

"A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement." App. 13a–14a.

[7] Paragraph 3 provides:

"The United Mine Workers of America and the operators agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Local and District Disputes' section of this agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract provided and by collective bargaining without recourse to the courts." App. 15a.

affirm . . . that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Local and District Disputes' section . . . ." It excepts from the arbitration obligation only those disputes "national in character."

This arbitration provision appears sufficiently broad to encompass the instant dispute. The contractual obligation reaches "any local trouble of any kind aris[ing] at the mine," and the continued presence in Gateway Mine of two particular foremen is plainly a local issue. On its face, this contractual language admits of only one interpretation: that the agreement required the union to submit this dispute to arbitration for resolution by an impartial umpire.

The Court of Appeals avoided this conclusion by reference to an assumed public policy disfavoring arbitration of safety disputes. The majority of that court recognized that the usual federal policy encourages arbitration of labor disputes but reasoned that this presumption of arbitrability applies only to disagreements over "wages, hours, seniority, vacations and other economic matters." 466 F. 2d, at 1159. The court thought that safety disputes should be treated as *sui generis,* and concluded that it should "reject any avoidable construction of a labor contract as requiring final disposition of safety disputes by arbitration." [8] *Id.,* at 1160. We disagree.

---

[8] In finding a public policy disfavoring arbitration of safety disputes, the court reasoned as follows:

"Considerations of economic peace that favor arbitration of ordinary disputes have little weight here. Men are not wont to submit matters of life or death to arbitration and no enlightened society encourages, much less requires, them to do so. If employees believe that correctible circumstances are unnecessarily adding to the normal dangers of their hazardous employment, there is no sound reason for requiring them to subordinate their judgment to

The federal policy favoring arbitration of labor disputes is firmly grounded in congressional command. Section 203 (d) of the Labor Management Relations Act, 29 U. S. C. § 173 (d), states in part:

> "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."

In the *Steelworkers* trilogy,[9] this Court enunciated the now well-known presumption of arbitrability for labor disputes:

> "An order to arbitrate the particular grievance should not be denied unless it may be said with posi-

that of an arbitrator, however impartial he may be. The arbitrator is not staking his life on his impartial decision. It should not be the policy of the law to force the employees to stake theirs on his judgment." 466 F. 2d, at 1160.

We find this analysis unpersuasive for the reasons stated in this section of our opinion.

The Court of Appeals also relied on § 502 of the Labor Management Relations Act, 29 U. S. C. § 143. Section 502 provides that "the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work" shall not "be deemed a strike under this chapter." On its face, this section appears to bear more directly on the scope of the no-strike obligation than on the arbitrability of safety disputes. Indeed, there is nothing in the legislative history to suggest that § 502 was intended as a limit on arbitration. See 1 Legislative History of the Labor Management Relations Act, 1947, pp. 29, 156, 290, 436, 573, 895 (G. P. O. 1948). For this reason, we reserve our discussion of § 502 until Part III of this opinion. To the extent that § 502 might be relevant to the issue of arbitrability, we find that the considerations favoring arbitrability outweigh the ambiguous import of that section in the present context.

[9] *United Steelworkers of America* v. *American Mfg. Co.,* 363 U. S. 564 (1960); *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.,* 363 U. S. 574 (1960); *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593 (1960).

tive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 582–583 (1960).

The Court also elaborated the basis for this policy. It noted that commercial arbitration and labor arbitration have different objectives. In the former case, arbitration takes the place of litigation, while in the latter "arbitration is the substitute for industrial strife." *Id.*, at 578. A collective-bargaining agreement cannot define every minute aspect of the complex and continuing relationship between the parties. Arbitration provides a method for resolving the unforeseen disagreements that inevitably arise. And in resolving such disputes, the labor arbitrator necessarily and appropriately has resort to considerations foreign to the courts:

> "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment

whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs." *Id.,* at 581–582.

We think these remarks are as applicable to labor disputes touching the safety of the employees as to other varieties of disagreement. Certainly industrial strife may as easily result from unresolved controversies on safety matters as from those on other subjects, with the same unhappy consequences of lost pay, curtailed production, and economic instability. Moreover, the special expertise of the labor arbitrator, with his knowledge of the common law of the shop, is as important to the one case as to the other, and the need to consider such factors as productivity and worker morale is as readily apparent.

The Court of Appeals majority feared that an arbitrator might be too grudging in his appreciation of the workers' interest in their own safety. We see little justification for the court's assumption, especially since the parties are always free to choose an arbitrator whose knowledge and judgment they trust. We also disagree with the implicit assumption that the alternative to arbitration holds greater promise for the protection of employees. Relegating safety disputes to the arena of economic combat offers no greater assurance that the ultimate resolution will ensure employee safety. Indeed, the safety of the workshop would then depend on the relative economic strength of the parties rather than on an informed and impartial assessment of the facts.

We therefore conclude that the "presumption of arbitrability" announced in the *Steelworkers* trilogy applies to safety disputes, and that the dispute in the instant

case is covered by the arbitration clause in the parties' collective-bargaining agreement.[10]

## III

The second question is whether the District Court had authority to enjoin the work stoppage. The answer depends on whether the union was under a contractual duty not to strike. In *Boys Markets, Inc.* v. *Retail Clerks Union,* 398 U. S. 235 (1970), the Court considered the proper accommodation between the literal terms of § 4 of the Norris-LaGuardia Act [11] and the subsequently

---

[10] The Court of Appeals also found support for its refusal to order arbitration in § (e) of the collective-bargaining agreement. Section (e) provides for an employee mine safety committee empowered to inspect mine facilities and equipment and to report its findings to the management. If the committee finds an "immediate danger," it may make a binding recommendation to remove all workers from the unsafe area.

Although the Court of Appeals did not state that § (e) was an express exception to the arbitration clause, it evidently believed that the section created an ambiguity in the agreement which had to be resolved against arbitrability. However, as the Court stated in *United Steelworkers of America* v. *Warrior & Gulf Navigation Co., supra,* "[d]oubts should be resolved in favor of coverage." 363 U. S., at 583. Thus, "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." *Id.,* at 584–585. Since § (e) clearly does not constitute an express exception to the arbitration clause, it follows that the safety dispute in the instant case must be deemed to fall within the broad arbitration clause.

The dissent maintains that the Federal Coal Mine Health and Safety Act of 1969, 83 Stat. 742, 30 U. S. C. § 801 *et seq.,* pre-empts the field and "displace[s] all agreements to arbitrate safety conditions." *Post,* at 394. Respondents have not made this contention, and a fair reading of the Act discloses no congressional intention, either express or implied, to accomplish such a drastic result.

[11] "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any

enacted provisions of § 301 (a) of the Labor Management Relations Act.[12]  The Court noted the shift in congressional emphasis "from protection of the nascent labor movement to the encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes."  398 U. S., at 251.  It concluded that § 301 (a) empowers a federal court to enjoin violations of a contractual duty not to strike.

Although the collective-bargaining agreement in *Boys Markets* contained an express no-strike clause,[13] injunctive relief also may be granted on the basis of an implied undertaking not to strike.  In *Teamsters Local* v. *Lucas Flour Co.,* 369 U. S. 95 (1962), the Court held that a contractual commitment to submit disagreements to final and binding arbitration gives rise to an implied obligation not to strike over such disputes.[14]  Indeed, the

case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment . . . ."  47 Stat. 70, 29 U. S. C. § 104.

[12] "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U. S. C. § 185 (a).

[13] 398 U. S., at 239 n. 3.

[14] *Lucas Flour* involved a damages action for breach of the implied no-strike obligation, while the present case involves injunctive relief. The policy reasons favoring the availability of injunctive relief, however, are equally compelling.  As the Court stated in *Boys Markets, Inc.* v. *Retail Clerks Union,* 398 U. S. 235, 248 (1970):

"[A]n award of damages after a dispute has been settled is no substitute for an immediate halt to an illegal strike.  Furthermore, an action for damages prosecuted during or after a labor dispute would

strong federal policy favoring arbitration of labor disputes was the linchpin of this Court's reasoning in *Boys Markets*. Denial of all equitable relief for breaches of no-strike obligations would have carried "devastating implications for the enforceability of arbitration agreements." 398 U. S., at 247. As MR. JUSTICE BRENNAN stated for the Court in that case:

> "[A] no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration. . . . Any incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated." *Id.*, at 248. (Citation omitted.)

Thus, an arbitration agreement is usually linked with a concurrent no-strike obligation, but the two issues remain analytically distinct. Ultimately, each depends on the intent of the contracting parties. It would be unusual, but certainly permissible, for the parties to agree to a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation. Such a contract would reinstate the situation commonly existing before our decision in *Boys Markets*. Absent an explicit expression of such an intention, however, the agreement to arbitrate and the duty not to strike should be construed as having coterminous application.

In the present case, the Court of Appeals identified two provisions which it thought excepted safety disputes from the general no-strike obligation. The first is § (e) of the collective-bargaining agreement, which provides for a union mine safety committee at each mine. As

only tend to aggravate industrial strife and delay an early resolution of the difficulties between employer and union."

this section was thought central to the outcome of this case, we set forth the relevant provisions in full:

"The mine safety committee may inspect any mine development or equipment used in producing coal. If the committee believes conditions found endanger the life [*sic*] and bodies of the mine workers, it shall report its findings and recommendations to the management. In those special instances where the committee believes an immediate danger exists and the committee recommends that the management remove all mine workers from the unsafe area, the operator is required to follow the recommendation of the committee.

"If the safety committee in closing down an unsafe area acts arbitrarily and capriciously, members of such committee may be removed from the committee. Grievances that may arise as a result of a request for removal of a member of the safety committee under this section shall be handled in accordance with the provisions providing for settlement of disputes." App. 12a.

The union contends that this provision reserves to the workers the right to strike over safety disputes and also that the committee's determination of "immediate danger" may be wholly subjective and without foundation in fact. In short, the safety committee may object to any aspect of mine operation as an "immediate danger" and call the workers off the job to force whatever changes it proposes. The union further argues that since the exercise of this option cannot constitute a breach of the collective-bargaining agreement, the District Court had no wrong to enjoin.

We need not decide whether § (e) is subject to such an expansive reading, for, as the District Court found, that section was never invoked in this controversy. The safety committee did inspect the mine to determine the

cause of the ventilation failure, but there was no show-
ing that it ever reported findings or made recommenda-
tions to the company management. Nor was there any
showing that the committee found conditions dangerous
to the "life [*sic*] and bodies of the mine workers" or which,
if any, of its members formed the requisite belief in the
existence of "an immediate danger."

The Court of Appeals majority apparently believed
that the vote by the local membership, the body superior
to the union safety committee, constituted substantial
compliance with the purpose and intent of § (e) and
obviated any need for compliance with the formal pro-
cedure. As a matter of simple contractual interpreta-
tion, we think that proposition doubtful. Under the
union's construction of § (e), the committee's good-faith
belief in the existence of an immediate danger, no matter
how unfounded that view, is conclusive. The manage-
ment's only recourse against arbitrary and capricious
decisions by the committee is to seek removal of the
offending members. Circumvention of the procedures
of § (e), including a formal vote by the committee mem-
bers, thus removes the only deterrent to unreasonable
action by the committee. Given this circumstance, one
would not lightly assume that failure to follow the
specific procedures outlined in § (e) is somehow *de
minimis*. In any event, whether the union properly
invoked this provision is a substantial question of con-
tractual interpretation, and the collective-bargaining
agreement explicitly commits to resolution by an impar-
tial umpire all disagreements "as to the meaning and
application of the provisions of this agreement." [15]

---

[15] Respondents also argue that Paragraph 1 of the "Miscellaneous"
section of the agreement disavows any intent to impose a no-strike
duty. Paragraph 1 provides:

"1. Any and all provisions in either the Appalachian Joint Wage

The Court of Appeals majority also based its denial of injunctive relief on § 502 of the Labor Management Relations Act, 29 U. S. C. § 143, which provides in part:

"[N]or shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this chapter."

This section provides a limited exception to an express or implied no-strike obligation. The Court of Appeals held that "a refusal to work because of good faith apprehension of physical danger is protected activity and not enjoinable, even where the employees have subscribed to a comprehensive no-strike clause in their labor contract." 466 F. 2d, at 1160. We agree with the main thrust of this statement—that a work stoppage called solely to protect employees from immediate danger is authorized by § 502 and cannot be the basis for either a damages award or a *Boys Markets* injunction.

The Court of Appeals majority erred, however, in con-

Agreement of June 19, 1941, or the National Bituminous Coal Wage Agreement of April 11, 1945, containing any 'no strike' or 'penalty' clause or clauses or any clause denominated 'Illegal Suspension of Work' are hereby rescinded, cancelled, abrogated and made null and void." App. 14a.

This paragraph effectively rescinds certain no-strike clauses in two prior agreements. It does not, however, purport to negate any no-strike duty created by the present agreement. As we have noted, the agreement makes arbitration the exclusive and compulsory means for finally resolving disputes. Under *Teamsters Local* v. *Lucas Flour Co.*, 369 U. S. 95 (1962), this arbitration provision gives rise to an implied no-strike duty. We do not think that Paragraph 1 can be fairly construed as an exception to that no-strike duty. Cf. *Lewis* v. *Benedict Coal Corp.*, 259 F. 2d 346 (CA6 1958) (Stewart, J.), affirmed by an equally divided Court, *sub nom. Mine Workers* v. *Benedict Coal Corp.*, 361 U. S. 459 (1960).

cluding that an honest belief, no matter how unjustified, in the existence of "abnormally dangerous conditions for work" necessarily invokes the protection of § 502. If the courts require no objective evidence that such conditions actually obtain, they face a wholly speculative inquiry into the motives of the workers. As Judge Rosenn pointed out in his dissent from the judgment below, the difficulty occasioned by this view is especially apparent where, as here, the claim concerns not some identifiable, presently existing threat to the employees' safety, but rather a generalized doubt in the competence and integrity of company supervisors.[16] Any employee who believes a supervisor or fellow worker incompetent and who honestly fears that at some future time he may commit some unspecified mistake creating a safety hazard could demand his colleague's discharge and walk off the job despite the contractual agreement not to do so. Absent the most explicit statutory command, we are unwilling to conclude that Congress intended the public policy favoring arbitration and peaceful resolution of labor disputes to be circumvented by so slender a thread as subjective judgment, however honest it may be. We agree with Judge Rosenn that a union seeking to justify a contractually prohibited work stoppage under

---

[16] Judge Rosenn contended with justification that a wholly subjective test would open "new and hazardous avenues in labor relations for unrest and strikes." He stated:

"This test will require a court to accept the naked assertion of an employee that the presence of one of his fellow employees in a plant constitutes a safety hazard. If employees may label another employee a working risk and thereupon engage in a work stoppage which, because of its characterization as a safety strike, is unreviewable by arbitration or court, no employer can expect stability in labor relations. Moreover, each employee is the possible victim of the attitudes, fancies and whims of his fellow employees. Unions, themselves, will be at the mercy of 'wildcatters.'" 466 F. 2d, at 1162.

§ 502 must present "ascertainable, objective evidence supporting its conclusion that an abnormally dangerous condition for work exists." 466 F. 2d, at 1162. We find this reading of the statute consistent both with common sense and with its previous application. See, *e. g., Philadelphia Marine Trade Assn.* v. *NLRB,* 330 F. 2d 492 (CA3), cert. denied *sub nom. International Longshoremen's Assn.* v. *NLRB,* 379 U. S. 833 and 841 (1964); *NLRB* v. *Fruin-Colnon Construction Co.,* 330 F. 2d 885 (CA8 1964); *NLRB* v. *Knight Morley Corp.,* 251 F. 2d 753 (CA6 1957), cert. denied, 357 U. S. 927 (1958); *Redwing Carriers, Inc.,* 130 N. L. R. B. 1208 (1961), enf'd as modified, *sub nom. Teamsters Local 79* v. *NLRB,* 117 U. S. App. D. C. 84, 325 F. 2d 1011 (1963), cert. denied, 377 U. S. 905 (1964).

### IV

On the facts of this case, we think it clear that § 502 did not deprive the District Court of authority to enforce the contractual no-strike obligation. The union inferred from the foremen's failure to record the reduced airflow on the morning of April 15 that their return to the job created an abnormally dangerous working condition. One may doubt whether this assertion alone could suffice to invoke the special protection of § 502. In any event, the District Court resolved the issue by expressly conditioning injunctive relief on the suspension of the two foremen pending decision by the impartial umpire.

For similar reasons, it is also evident that injunctive relief was appropriate in the present case under the equitable principles set forth in *Boys Markets, Inc.* v. *Retail Clerks Union,* 398 U. S., at 254. The District Court found that the union's continued breach of its no-strike obligation would cause irreparable harm to the petitioner. It eliminated any safety issue by suspending the two foremen pending a final arbitral decision.

In these circumstances, we cannot say that the District Court abused its discretion.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

I

The dispute in this labor case does not involve hourly wages, pension benefits, or the like. It involves the life and death of the workers in the most dangerous occupation in America.[1] The history of the coal miner is a history of fatal catastrophes, which have prompted special protective legislation.[2] Nor was the mine involved here an exception. It is classified by the United States Bureau of Mines as "especially hazardous," triggering special inspection procedures to insure the safety of the men who work it. Federal Coal Mine Health and Safety Act of 1969, § 103 (i), 83 Stat. 750, 30 U. S. C. § 813 (i). Congress has received testimony about safety problems at this mine in which the workers, a year before this dispute, complained of the supervisors' negligence in safety matters, particularly their practice of "not testing for gas."[3] At those hearings Senator Harrison Williams, the principal author of the 1969 mine safety act, commented that the enforcement performance of the United States Bureau of Mines was "outrageous . . . just plain unbelievable."[4]

---

[1] Bureau of Labor Statistics, Injury Rates by Industry, 1970, pp. 3, 6 (Report No. 406, 1972).

[2] S. Rep. No. 91–411, pp. 3–6; H. R. Rep. No. 91–563, pp. 1–3.

[3] Hearings on Health and Safety in the Coal Mines before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 91st Cong., 2d Sess., 27, 351 (1970).

[4] *Id.*, at 191.

It was in the context of this history that the workers discovered that three of their foremen had negligently failed to check and record the airflow in the mine before the daylight shift began, as was their duty. Instead they made false entries in their log books. As a result, they had not discovered that the airflow in the mine was 11,000 cubic feet per minute rather than the normal 28,000. Reduced airflow can result in a buildup of methane gas, creating conditions for accidental explosions resulting from the operation of normal mining equipment. The workers walked off the job and refused to return unless the foremen were removed. The majority passes off the workers' concern here as only "a generalized doubt in the competence and integrity of company supervisors" as if there were only unfounded fears about a few men in an operation with an exemplary safety record. Yet the foremen in question pleaded *nolo contendere* to state charges of falsifying the records involved in this incident, and their admitted misfeasance is precisely the kind of reckless disregard for the miners' safety which permeates the history of this industry.

In response to this history, the union obtained, in the collective-bargaining agreement in force during this incident, a provision for a union "mine safety committee" with the authority to present the mine operator with a binding "recommendation" that all workers be removed from an unsafe mine area. The agreement provides no recourse for the operator in disagreement with the committee's determinations, although he may subsequently seek removal from the committee of members he believes to have acted arbitrarily. Yet it is clear from this provision that the union reserved to itself the authority to determine that a mine be closed because of safety hazards. Although there is an explicit provision that a dispute over whether a committee member should be removed is arbitrable, there is no such provision for arbitration

if the mine operator disagrees with the committee's recommendation. The inescapable inference, absent any contrary presumption, is that this question is not subject to arbitration.[5] And in what clearly appears to be a buttress to the union's authority in this matter, all no-strike provisions from prior contracts were explicitly excluded from the agreement in question here, which contains no such commitment on the part of the union.

This is the contractual context in which the employer brought this action, under § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185, to compel arbitration of the safety dispute and enjoin the work stoppage. It is, of course, clearly established that because of congressional policy favoring arbitration of labor disputes, a general arbitration provision, as found in the agreement here in question, is broadly construed. *Steelworkers* trilogy (*United Steelworkers of America* v.

---

[5] This inference is strengthened by the agreement's provisions for arbitration if the operator objected to recommendations by federal coal mine inspectors. § (b)(2) of the agreement. There would obviously be no need for this special arbitration provision if the parties felt that safety questions could be handled through the regular arbitration machinery.

Indeed the provision in question here has a long history supporting this construction. The 1946 agreement, known as the Krug-Lewis agreement, and arising from President Truman's seizure of the mines in 1946, *United States* v. *United Mine Workers of America*, 330 U. S. 258, expressly permitted union safety committees to initiate safety stoppages, although the Federal Coal Mines Administrator (Capt. N. H. Collisson), was given authority to halt such a stoppage. At hearings following the Centralia mine disaster, resulting in the death of 111 miners, Secretary of the Interior Krug testified that the meaning of the provision "was to give the mine safety committee complete authority to get the men out of the mine, if they felt the mine was unsafe . . . ." Hearings pursuant to S. Res. 98 before a Special Subcommittee of the Senate Committee on Public Lands, 80th Cong., 1st Sess., 312. The predecessor to the current provision appeared in the National Bituminous Coal Wage Agreement of 1947, which deleted Collisson's authority to override the miners.

*American Mfg. Co.*, 363 U. S. 564; *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574; *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593). This policy is grounded, as the majority points out, in the expression of policy by the Labor Management Relations Act. And once a dispute is determined to be arbitrable, there is an implied agreement by the union not to strike, *Teamsters Local* v. *Lucas Flour Co.*, 369 U. S. 95, which is enforceable by a federal court injunction under the principles enunciated in *Boys Markets, Inc.* v. *Retail Clerks Union*, 398 U. S. 235, because of the close relationship between the duty to arbitrate and the duty not to strike. *Lucas Flour, supra,* at 104–106; *Boys Markets, supra,* at 247–249.

Yet this whole scheme, grounded as it is on congressional expression of policy, must allow for any congressionally indicated exceptions to that policy. In a § 301 suit the federal courts are to apply federal law "which the courts must fashion from the policy of our national labor laws." *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 456. Although the "presumption of arbitrability" might be sufficient in the ordinary case to overcome the contrary implications in the collective-bargaining agreement involved here, I find that presumption seriously weakened in the area of safety disputes by § 502 of the Labor Management Relations Act, 29 U. S. C. § 143, which expressly shields walk-offs by workers concerned for their safety: That section reads in part: "[N]or shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this chapter." Although there is nothing in the legislative history of this section to shed light on its purpose, the words of the section are themselves fairly clear. They recognize in the law what is in any case an unavoidable principle of

human behavior: self preservation. As Judge Hastie said for the majority in the Court of Appeals: "Men are not wont to submit matters of life or death to arbitration . . . ." 466 F. 2d 1157, 1160.

This is an area involving "the penumbra of express statutory mandates" to be solved "by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy." *Lincoln Mills, supra,* at 457. Although there is a general policy favoring arbitration, I do not find that Congress intended to extend that policy here. Application of the "presumption of arbitrability" is not inevitable in every labor dispute. But miners' determination to act to protect their own safety is as inevitable in labor disputes as elsewhere. Absent any presumption, I cannot find that the dispute here was arbitrable or that the union was under any duty not to strike. It follows then, as the Court of Appeals found, that there was no wrong to remedy.

## II

Congress in 1969 set up pervasive administrative controls over working and environmental conditions with the coal mines,[6] 83 Stat. 742. The need for a more effective regulatory scheme was described in H. R. Rep. No. 91–563. The 1969 Act states in its findings and purpose that "the first priority and concern of all in the coal mining industry must be the health and safety of

---

[6] The hazards of various working conditions to the health of workers have been of great concern to Congress, its latest Act being the Occupational Safety and Health Act of 1970, 84 Stat. 1590, which in terms does not exclude employees who are in the coal-mining business. The Act looks toward increasing the quality of the environment in which employees work and of improving the workmen's compensation system under which they are protected. See Brodeur, Casualties of the Workplace, New Yorker, Nov. 19, 1973, p. 87, for an account of the industrial-medical complex that works to keep plants profitable to the owners and dangerous to the workers.

its most precious resource—the miner." § 2 (a), 30 U. S. C. § 801 (a). Ease of investigating mines was insured. The Act provides that when a representative of the miners believes that a violation of a mandatory standard exists and an imminent danger exists, the right of immediate inspection is given the Federal Government. § 103 (g), 30 U. S. C. § 813 (g). The Secretary of the Interior may make a spot investigation of a mine for five working days when he believes hazardous conditions exist. § 103 (i), 30 U. S. C. § 813 (i). Once a hazardous condition is found the Secretary can order that all miners be evacuated from the area and prohibited from entering it. § 104 (a), 30 U. S. C. § 814 (a). The Secretary can abate mining in incipient or potential mining areas, § 105, 30 U. S. C. § 815; and his orders are within limits subject to judicial review by the miners as well as by the operators. § 106, 30 U. S. C. § 816.

Detailed ventilating requirements are placed in the Act, § 303, 30 U. S. C. § 863; and examinations of each mine must be made within "three hours immediately preceding the beginning of any shift." § 303 (d)(1), 30 U. S. C. § 863 (d)(1). Examinations for hazardous conditions must be made at least once a week, § 303 (f), 30 U. S. C. § 863 (f); and weekly investigations of ventilating conditions must be made and various monitors which detect dangerous gases must be installed, § 303 (1), 30 U. S. C. § 863 (*l*). The regulatory scheme covers the subject matter in minute detail.

Penalties run against operators of mines and also against miners who violate in specified ways "mandatory safety standards." Compensation of miners laid off by closed mines is provided, § 110 (a), 30 U. S. C. § 820 (a); and miners are protected against discharge or other discrimination by protests they have made against the operations by testimony they have given. § 110 (b), 30 U. S. C. § 820 (b).

Title IV of the Act treats disability payments and payments for the death of miners. It bolsters state workmen's compensation laws and makes the owners liable, through self-insurance or through liability insurance, where an adequate state law does not exist, § 423, 30 U. S. C. § 933. State laws inconsistent with the federal act are suspended; but state laws which provide more stringent standards or controls survive, § 506, 30 U. S. C. § 955.

A close reading of this Act convinces me that it must displace all agreements to arbitrate safety conditions. It is in that respect a more extreme case than *U. S. Bulk Carriers* v. *Arguelles,* 400 U. S. 351, where we held that a federal statute giving seamen a specific judicial remedy was not displaced by arbitration. When it comes to health, safety of life, or determination of environmental conditions within the mines, Congress has pre-empted the field. An arbiter is no part of the paraphernalia described in the Act. An arbiter seeks a compromise, an adjustment, an accommodation. There is no mandate in arbitration to apply a specific law. Those named in the present Act who construe, apply, and formulate the law are the Secretary and the courts.

Moreover, arbitration awards might compromise administration of the 1969 Act. Rulings of arbiters might not jibe with rulings of the Secretary. Rulings of the arbiters might even color claims for compensation or damages by negativing the very basis of liability either in workmen's compensation Acts or in state lawsuits for damages.

Hence, though I disagree with the way in which the Court reads this particular arbitration clause, I conclude that even though the collective-bargaining agreement is read to authorize arbitration, the 1969 Act precludes it. The 1969 Act specifies the arms of the law which handle these matters of safety of mines. Congress has given arbiters no share of the power.