**IOWA BEEF PROCESSORS, INC., (formerly known as Iowa Beef Packers, Inc., a corporation), Appellee and Cross-Appellant,**

v.

**AMALGAMATED MEAT CUTTERS & BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO, Local Union No. 1135, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO, Local Union No. 1196, and Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO, Local Union No. 1277, Appellants and Cross-Appellees.**

Nos. 78–1248, 78–1268.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1978.

Decided May 1, 1979.

John M. Bowlus of Cotton, Watt, Jones, King & Bowlus, Chicago, Ill. (argued), Russell Woody, Chicago, Ill., and Harry H. Smith, Sioux City, Iowa, on brief, for appellants Amalgamated Meat Cutters, etc., et al.

P. L. Nymann of Jacobs, Gaul, Nymann & Green, Sioux City, Iowa (argued), and Herschel G. Langdon of Herrick, Langdon, Belin, Harris, Langdon & Helmick, Des Moines, Iowa, on brief, for appellee Iowa Beef Processors, Inc.

Before LAY, BRIGHT, and ROSS, Circuit Judges.

BRIGHT, Circuit Judge.

Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (the International), and three of its local unions (the locals)[1] appeal from a judgment of the district court,[2] following a jury trial, awarding $1,756,592 to Iowa Beef Processors, Inc. (IBP or the Company) on IBP's claims that the Unions breached the no-strike provisions of the collective bargaining agreements at IBP's Fort Dodge, Mason City, and LeMars, Iowa, beef processing plants.

On appeal, the Unions raise the following issues:

(1) As to the alleged breach of contract at the Fort Dodge plant, the trial court erred in denying motions for judgment notwithstanding the verdicts or for a new trial, because

(a) the no-strike provision of the Fort Dodge collective bargaining agreement did not prohibit sympathy strikes, and

(b) the Unions' representatives declared the strike unauthorized and ordered their members back to work pursuant to contractual terms;

(2) Regarding the Mason City plant, the trial court erred in denying motions for judgment notwithstanding the verdicts or for a new trial because IBP voluntarily closed the plant, thereby precluding its recovery of damages under a breach of contract action;

(3) The trial court erred in failing to grant the Unions' motions for judgment notwithstanding the verdicts or for a new trial because IBP failed to prove that it had sustained damages at the Mason City, LeMars, and Fort Dodge plants attributable to the Unions' conduct;

(4) The trial court committed prejudicial error in permitting the jury to consider evidence of alleged acts of sabotage which preceded the strikes against the Mason City and LeMars plants; and

(5) The trial court's error in submitting a form of verdict which permitted the jury to assess compensatory damages jointly against the International and the locals warrants a new trial.

IBP cross-appeals from the judgment insofar as it excludes punitive damages and attorneys' fees.

Upon a careful examination of the record, we affirm the judgment of the district court on the appeal and cross-appeal.

I. *Factual Background.*

The present controversy arose in the wake of a lawful economic strike by the International and its local union at IBP's beef processing plant in Dakota City, Nebraska, on August 24, 1969. The Dakota City strike, which was particularly bitter, terminated on April 13, 1970, after the International and IBP negotiated a contract. From September-October 1969, labor difficulties arose at IBP plants in Mason City, LeMars, and Fort Dodge, Iowa. At each of the three Iowa facilities, collective bargaining agreements containing no-strike clauses governed management-employee relations.

At a union meeting in September 1969, Jim Robinson, an official of the International, allegedly directed Mason City plant employees to "[d]o anything you can to slow down the line or stop the line." Through September 1969, the Mason City plant experienced incidents of damage to machinery and slowdowns in the production processes. By early October 1969, the obstructive ac-

---

1. The three locals, all located in Iowa, are Local 1135 (Fort Dodge), Local 1196 (Mason City), and Local 1277 (LeMars). Collectively, the International and the three locals will be referred to as "the Unions."

2. The Honorable Warren K. Urbom, Chief Judge, United States District Court for the District of Nebraska, sitting by designation in the Northern District of Iowa.

tions had intensified to such a degree that IBP sought a court order authorizing it to close the plant.[3] IBP obtained such permission at about 1:30 p. m. on October 6, 1969.

On the morning of October 6, a brisket saw used on the "kill floor" of the Mason City plant broke. The ensuing dispute between management and Bill Neve, the Mason City Local's president, over whether production could continue while the saw remained inoperable, led to an IBP order halting the further killing of cattle that day. IBP informed its kill floor employees that they would be advised when the kill floor would recommence operations. At about 12:30 p. m., Neve told the plant superintendent that "this is a lockout, and if the kill doesn't work no one works." The superintendent replied that only the kill floor was closed, but Neve repeated that "no one is going back to work, this is a lockout." By 1:00 p. m. all of the employees had left the plant. They did not return until May 25, 1970.[4]

Shortly after the conflict at the Mason City plant came to a head, the LeMars plant began to experience similar difficulties. During October 7–17, 1969, production dropped sharply due to various alleged acts of sabotage, including considerable damage to machinery. On October 17, after IBP suspended two employees for fighting, Bob McKelvey, president of the LeMars local, demanded immediate reinstatement of one of the workers. IBP's refusal to meet that demand precipitated a walkout by the employees that afternoon. Work at the LeMars plant did not resume until June 11, 1970.[5]

The third and final flareup occurred at the Fort Dodge plant. At union meetings in mid-October 1969, officers of the Fort Dodge local advised their members that, if pickets from the Dakota City plant showed up at the Fort Dodge plant, they did not have to honor them, but as "good union members" they should do so. Tony Fetter, a representative of the International, also stated that a good union member would not cross a picket line and that those who honored the picket line would receive strike benefits. Moreover, a witness at trial testified that Mr. Fetter said that "it wouldn't make any difference if the strike was legal or illegal, Iowa Beef would eventually beg us to come back to work, if we stuck together." When the pickets from the Dakota City and Mason City plants appeared at the Fort Dodge plant on October 20, virtually all of the employees honored the picket line. Although David Hart, a vice president of the International, declared the strike was unauthorized and ordered union members back to work, his announcement went unheeded.[6] The union members who respected the picket line at Fort Dodge received strike benefits from the Interna-

---

3. IBP needed a court order as a result of an antitrust suit brought by the United States following IBP's acquisition of the plants in Mason City and LeMars, Iowa, on August 1, 1969. That suit was settled on March 23, 1970, by a consent decree in which IBP undertook to divest itself of the Mason City and LeMars plants.

4. The collective bargaining agreement governing work relations at the Mason City plant states in pertinent part:

 All differences which may arise under the terms of this Agreement between Company and employees, or between Company and Union, including violations of an employee's working conditions or an employee's complaint of excessive job loads, shall be processed and settled through the grievance procedure provided and there shall be no strike, walkout, stoppage, slow down or suspension of work, boycott of any kind on the part of the Union or its members or any employees represented by it, nor any lock·out on the part of the Company during the term of this Agreement. The parties have provided a sufficiently complete method and procedure for amicable settlement of any complaint or dispute which may arise and therefore there shall be no strike, walkout, of employees nor any lock-out by Company during the life of this Agreement.

5. The "no strike" clause controlling the LeMars plant was similar in scope and effect to that at Mason City. See n.4, supra.

6. In a subsequent interview in November 1969, Hart stated that he would not have crossed the picket line, even though refusing to cross would have been a violation of the contract.

tional from early November 1969 until production resumed in April 1970.[7]

On October 24, 1969, IBP filed the present action under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976). IBP's complaint charged the Unions with violating the no-strike provisions of the collective bargaining agreements at the Mason City, LeMars, and Fort Dodge plants by urging the withholding of production and by instigating acts of sabotage and strikes. IBP sought to recover damages caused by the strikes, allegedly in violation of the collective bargaining agreements, but not for losses directly attributable to the acts of sabotage.

Following a one-month trial from May 16–June 13, 1977, the jury returned a verdict in favor of IBP, awarding compensatory damages of $1,756,592, and punitive damages amounting to $840,374.[8] Upon the Unions' motions for judgment notwithstanding the verdicts or for a new trial, the trial court vacated the punitive damage awards, but denied the motions in all other respects. The court also denied IBP's request for attorneys' fees. The present appeals followed.

## II. *The Fort Dodge Strike.*

The Unions claim that the work stoppage at the Fort Dodge plant did not breach the no-strike provision of the Fort Dodge collective bargaining agreement because (1) the waiver of the right to engage in a sympathy strike must be made in clear and unmistakable language and no such waiver was made in the Fort Dodge contract,[9] and (2) the relinquishment of the right to strike should be interpreted as being coterminous with the duty to arbitrate, and because the dispute underlying the Fort Dodge action was not arbitrable under the contract, the no-strike clause did not prohibit the sympathy strike.[10]

The district court held that the Fort Dodge agreement prohibited sympathy strikes, reasoning that the no-strike clause appears to bar *all* types of strikes and that the extent of the no-strike obligation reaches beyond issues covered by the arbitration clause. The district court determined that the Unions had failed to establish a defense as a matter of law to the breach of contract action and, accordingly, submitted the case to the jury. The district court did not err in this conclusion.

### A. *No-Strike Clause.*

Article VI of the Fort Dodge contract states:

> During the term of this Agreement there shall be no strike, stoppage, deliberate withholding of production, or suspen-

---

7. The Fort Dodge collective bargaining agreement states in pertinent part:

 During the term of this Agreement there shall be no strike, stoppage, deliberate withholding of production, or suspension of work on the part of the union or its members[.]

8. On the Fort Dodge breach of contract claim, the jury awarded $1,129,489 for actual damages against the International and Local 1135 jointly. Regarding the Mason City strike, the award was $355,692 in compensatory damages against both the International and Local 1196, plus punitive damages of $405,500 against the International, and $14,687 against Local 1196. Regarding the LeMars strike, the award was $271,411 in compensatory damages against the International and Local 1277 jointly, plus punitive damages of $405,500 against the International and $14,687 against Local 1277.

9. In support of this proposition, the Unions cite the following cases: *Mastro Plastics Corp. v. NLRB* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309

(1956); *Hyster Co. v. Independent Towing and Lifting Machine Assoc.,* 519 F.2d 89 (7th Cir. 1975), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3220, 49 L.Ed.2d 1216 (1976); *Gary Hobart Water Corp. v. NLRB,* 511 F.2d 284 (7th Cir.), *cert. denied,* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975); *Newspaper Production Co. v. NLRB,* 503 F.2d 821 (5th Cir. 1974); and *Kellogg Co. v. NLRB,* 457 F.2d 519 (6th Cir.), *cert. denied,* 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972).

10. The Unions rely on the following cases to establish that the scope of a no-strike clause extends only to those issues subject to arbitration; *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); *Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

sion of work on the part of the union or its members[.]

In addition, the parties adopted the following supplement to the no-strike clause:

In the implementation of Article VI of the agreement the following rules shall be binding on the parties.

I. The Union, both local and Internation[al], shall immediately take the following steps.

(1) the Union shall declare publicly that such action is unauthorized.

(2) the Union shall promptly order its members to resume their normal duties notwithstanding the existence of any picket line.

 Contractual language, circumstances external to the collective bargaining agreement, and policy considerations support the district court's determination that the no-strike provision of the Fort Dodge collective bargaining agreement barred sympathy strikes.

First, the Fort Dodge no-strike clause is broadly worded, declaring "there shall be no strike, stoppage, deliberate withholding of production, or suspension of work on the part of the union[.]" The district court appropriately observed that nothing about the language of the clause or any evidence of negotiations diminished the scope of the no-strike prohibition.[11] In addition, the supplement to the no-strike clause, indicating that union members are "to resume their normal duties notwithstanding the existence of *any* picket line" (emphasis supplied), permits the inference that under the collective bargaining agreement the local union waived its right to support any picket line, including a picket line of another local (of the International Union), at an employer's plant.

Second, contemporaneous with the commencement of the Fort Dodge strike, several of the Unions' officials declared that the strike was unauthorized and that union members should return to work. These statements of the Union representatives provide collateral evidence of contractual intent, indicative of the Unions' belief that the sympathy strike violated the Fort Dodge collective bargaining agreement. *Cf. News Union of Baltimore v. NLRB*, 129 U.S.App.D.C. 272, 276–277, 393 F.2d 673, 677–78 (1968) (directions from union leaders to union members to cross picket lines deemed evidence that refusal to do so violated the collective bargaining agreement).

Finally, "[i]n light of the necessary balancing of policy demands in situations where unions have resorted to economic force," the determination of the scope of the no-strike obligation requires "a case-by-case analysis of the language of the [collective] bargaining [agreement] in issue and [of its] operation within the factual circumstances of the labor controversy at hand." *NLRB v. Keller-Crescent Co.,* 538 F.2d 1291, 1295–96 (7th Cir. 1976). In light of the broad wording of the no-strike provision and the supplementary memorandum, which suggest the provision's total prohibition of strikes, and in light of the external circumstances indicating the Unions' leadership's understanding that the collective bargaining agreement forbade sympathy strikes, we agree with the district court's conclusion that the language of the bargaining agreement barred sympathy strikes. The reasoning employed in another labor case is particularly apt here:

We find nothing in the bargaining contract or the record to persuade us that the Union did not bargain away its right to refuse to cross the picket line * * *. The work stoppage clause is broad. * * The benefits to be derived by employees by refusal to perform work orders across the picket line, such as here involved, are far less than the benefits to be derived from a strike concerning grievances against their own employer which situation is clearly covered by the no-strike clause.

* * * The public interest in prompt performance of necessary work is recog-

---

11. In *Montana-Dakota Utilities Co. v. NLRB,* 455 F.2d 1088 (8th Cir. 1972), we held that a broad no-strike provision precluded union members from refusing to cross a picket line in support of another union's grievance away from the employer's plant.

nized. The Company could not efficiently or economically carry out its recognized duty to the public if a work stoppage occurs every time a picket line is encountered where work is required. [*Montana-Dakota Utilities Co. v. NLRB*, 455 F.2d 1088, 1093–94 (8th Cir. 1972).]

■ We reject the Unions' argument that the arbitration clause, which does not extend to disputes underlying sympathy strikes, restricts the scope of the no-strike clause.[12] The Unions premise this contention on the Supreme Court's statement in *Gateway Coal Co. v. UMW*, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974), that "the agreement to arbitrate and the duty not to strike should be construed as having coterminous application." In *Gateway Coal*, however, the Court defined the scope of an *implied* duty not to strike over an arbitrable dispute.[13] When an agreement contains an *express* no-strike clause, as in the instant case, the no-strike provision must be interpreted in light of the whole contract, rather than by looking only to the arbitration clause. *See Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). As the Court has instructed, "the two issues [the arbitration clause and the no-strike obligation] remain analytically distinct. Ultimately, each depends on the intent of the contracting parties." *Gateway Coal, supra*, 414 U.S. at 382, 94 S.Ct. at 639.

■ Because we view the scope of the arbitration provision as distinct from, and not by itself dispositive of, the extent of the no-strike obligation, we deem it immaterial that the arbitration machinery at the Fort Dodge plant could not resolve the issues underlying the sympathy strike.

**B.** *Compliance With the Supplement to the No-Strike Clause.*

■ The Unions claim that the district court erred in denying their motion for a directed verdict on the ground that union representatives had fulfilled the requirements of the supplemental memorandum to the no-strike clause of the Fort Dodge agreement by declaring the sympathy strike at Fort Dodge to be unauthorized and by directing union members to resume work.

The Unions did not raise this argument in their motion for a directed verdict, and, it therefore is not properly before us on review of the district court's denial of the motion for judgment n. o. v. *See Ralston Purina Co. v. Parsons Feed and Farm Supply, Inc.*, 364 F.2d 57, 59–60 (8th Cir. 1966); 5A *Moore's Federal Practice* ¶ 50.08, at 50–86 (2d ed. 1977).

■ In any event, we have examined the record and agree with the district court that the evidence did not compel the jury to conclude that the conduct of union representatives constituted fulfillment of their contractual obligations.

As we have already noted, the Unions' officials gave conflicting instructions to union members concerning observance of the picket line. Although the Unions' officials publicly stated that the strike was unauthorized and that employees should return to work, they also indicated, in effect, that union members ought not to cross the Fort Dodge picket line and that the International would support those refusing to cross the picket line with strike benefits.

The obligations imposed on the Unions by the supplementary agreement require a good faith effort at compliance.[14] The district court aptly observed that

The mere mouthing of words that employees should return to work does not

---

**12.** The grievance underlying the strike at Fort Dodge did not present any question that could be resolved directly through arbitration between the Fort Dodge management and the local union. The Fort Dodge strike was in support of another local union's economic grievance at another plant.

**13.** In *Gateway Coal*, the collective bargaining agreement lacked an express no-strike provision.

**14.** In *Wagner Electric Corp. v. Local 1104, International Union of Electrical, Radio and Machine Workers*, 496 F.2d 954, 956 (8th Cir.

necessarily fulfill the unions' obligation to use good faith in ordering a return to work.

On this record, the district court properly submitted the issue of the Unions' compliance with the supplement for resolution by the jury.

### III. *Mason City Shutdown.*

█ The Unions assert the evidence established that IBP voluntarily locked out its Mason City employees because operations at the Mason City plant were financially unsuccessful.

IBP claims that concerted activity—*i. e.,* acts of sabotage, slowdowns, and work stoppages by union members—forced management to close the Mason City plant. In support of this contention, IBP presented evidence demonstrating that, although IBP desired to close the Mason City facility prior to October 6, 1969, the day the local union walked out over the brisket-saw dispute, IBP did not receive court authorization to close the plant until shortly after the walkout.[15]

Whether financial loss or subversive conduct motivated the shutdown, constituted an issue for the jury. As the district court explained, different inferences could have been drawn from the controverted evidence and, under the circumstances, the jury was not bound to find this issue in favor of the Unions.

### IV. *Other Issues.*

The Unions challenge the findings of damages against them, contending that (a) IBP failed to show by a preponderance of the evidence that it suffered any damages, (b) the trial court erred in permitting the jury to receive evidence of alleged acts of sabotage relating to the claim for punitive damages, and (c) the form of verdict submitted to the jury improperly permitted the

assessment of compensatory damages against the International and local unions jointly.

### A. *Cause of Damage.*

█ During the course of the trial, IBP offered expert testimony indicating that the Company suffered losses resulting from the strikes. The Unions countered with expert testimony that a consumer boycott, rather than the strikes, cut into IBP's sales and that any residual negative financial impact from the strikes was or could have been met by shifting production to other IBP facilities. In light of the "battle of experts" and other controverted testimony, we will not interfere with the district court's determination that "it is not for the court to say which expert was correct. The jury received conflicting evidence and resolved it."

### B. *Sabotage Evidence.*

█ IBP, over objection, introduced evidence that the Mason City plant, from September 8–29, 1969, suffered production slowdowns attributable to acts of sabotage directed at the plant and plant equipment prior to the employee walkout of October 6, 1969. Similar incidents occurred at the LeMars plant from October 7, until the day of the LeMars walkout, October 17, 1969.

The Unions assert that the district court erred in admitting the sabotage evidence and argue that such evidence is irrelevant and prejudicial except as restricted to the punitive damage issue. Because the district judge ultimately denied IBP the punitive damage awards, the Unions contend that the admission of this evidence prejudiced their defense to the breach of contract claim for compensatory damages.

In admitting the evidence the trial judge commented that "the presence of numerous similar acts * * * tends to show activi-

---

1974), we held that the mere issuance of a press release directing union members to return to work did not absolve a union of liability for the violation of the no-strike provision because "[a] union is required to use its best

efforts to return striking workers to their jobs if it is not to be held responsible for their actions."

15. *See* n.3, *supra.*

ty on a concerted basis—planned basis." We agree. The number and nature of the sabotage incidents bear some relationship to the following issues: whether the Unions induced the closing of the Mason City plant; whether responsibility for the work stoppages over which IBP sought damages could be traced to the Unions; and whether union officials acted in good faith in instructing union members to resume work.

Accordingly, we reject this claim of error.

## C. *Joint Assessment of Damages.*

■ The Unions request a new trial on the ground that the form of verdict submitted to the jury improperly permitted the joint assessment of compensatory damages against the International and the locals. The Unions claim that in a section 301 action, the liabilities of an international union and of its affiliated local under a collective bargaining agreement to which both are parties, are several, not joint. Consequently, the trial court should have submitted a verdict form permitting the jury to apportion compensatory damages between the International and the local entities.

We reject the Unions' challenge to the form of verdict submitted to the jury in this case and approvingly note the reasoning employed by the district court on this issue:

The instructions and the verdict form required the jury to deal separately with the International and each of the locals on the issue of liability. No complaint can be made about that. The opposition goes to whether the jury should have been required to assess separate damages as to each defendant.

The answer is that damages were simply indivisible. All the evidence of damage related solely to the loss occurring from the prolonged strike at each plant.

Whether one defendant or both defendants as to a particular count caused the strike went to the question of liability. The strike itself caused the damage, according to the evidence. None of the damage was shown by any of the evidence to be separable from some other part of the damage. Thus, a defendant who caused the strike must be liable for all the damage; there was no basis for the jury to make any different determination.[16]

## V. *IBP'S Cross-Appeal.*

■ On its cross-appeal, IBP contends that the district court erred in setting aside the jury's award of punitive damages and in refusing to grant attorneys' fees.

The question of whether punitive damages are available in section 301 actions has come before this court on several previous occasions. *Emmanuel v. Omaha Carpenters District Council*, 560 F.2d 382 (8th Cir. 1977); *Bond v. Local Union 823, Int'l Brotherhood of Teamsters*, 521 F.2d 5 (8th Cir. 1975); *Butler v. Local Union 823, Int'l Brotherhood of Teamsters*, 514 F.2d 442 (8th Cir.), *cert. denied*, 423 U.S. 924, 96 S.Ct. 265, 46 L.Ed.2d 249 (1975). These cases emphasize the role of punitive damages in deterring future wrongdoing. On each occasion we found it unnecessary to resolve the issue, for, assuming *arguendo* the propriety of punitive damages in a section 301 action, the record in each of those cases failed to support an award of punitive damages.

In *Holodnak v. Avco Corp., Avco-Lycoming Division*, 514 F.2d 285, 291 (2d Cir.), *cert. denied*, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975), the Second Circuit held that

[w]here [plaintiff] has been fully compensated for any damage he sustained as a

---

**16.** The trial court carefully instructed the jury that the International and its three affiliated local unions were distinct entities. The instructions did not compel the jury, should it find a given local union liable, to return a verdict against the International. Moreover, the verdict form submitted to the jury specifically permitted it to find either the International or a local union liable, without imputing liability to the other. In light of the instructions, the joint assessment of actual damages against the International and the respective local unions on each of IBP's breach of contract claims indicates the jury found each organization liable for its particular actions.

result of the violation [of section 301], and where there has been an explicit finding that punitive damages are unnecessary to deter any future contravention, we are of the view that a greater exaction from [defendant] would not further any policy embodied in the [Labor Management Relations] Act.

In the instant case the district court found "no evidence * * * that punitive damages are necessary to deter the defendant unions from violating the contract in the future." We think the record adequately supports that determination.

The final issue we consider concerns the denial of attorneys' fees to IBP. IBP claims that it is entitled to an award of attorneys' fees because the Unions acted in bad faith in violating the contracts. *See Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 258, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

■■■ The determination of attorneys' fees rests within the discretion of the trial court and should not be disturbed absent a showing of an abuse of discretion. *Richardson v. Communications Workers of America*, 530 F.2d 126, 133 (8th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976). Upon examination of the entire record, we find no abuse of discretion concerning the attorneys' fees issue and, therefore, believe it improper to upset the considered judgment of the trial judge.

Accordingly, we affirm the judgment of the district court.