**NATIONAL MINE SERVICE COMPANY,**
Plaintiff,

v.

**UNITED STEELWORKERS OF AMER-ICA et al., Defendants.**

Civ. A. No. 74–216–E.

United States District Court,
N. D. West Virginia,
Elkins Division.

Dec. 9, 1974.

Kenneth R. Miller, Fairmont, W. Va., David H. Perez, Pittsburgh, Pa., for plaintiff.

Rudolph L. Milasich, Jr., Pittsburgh, Pa., for defendants.

MAXWELL, Chief Judge.

This is an action commenced under Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185 (1970), in which Plaintiff National Mine Service Company prospectively seeks to enjoin a threatened work stoppage by the membership of Local 8016 of the United Steelworkers of America, at its Morgantown Division works, and to compel submission of a pending dispute to binding arbitration, in accordance with the grievance-arbitration procedures set forth in the collective bargaining agreement in effect between Plaintiff and Defendant United Steelworkers of America.

During June, 1972, at a time when the Economic Stabilization Program of wage controls was in effect, the National Labor Relations Board certified Defendant Union as collective bargaining representative for production and maintenance employees at Morgantown Machine & Hydraulics, Inc. Defendant Union and Morgantown Machine immediately commenced collective bargaining negotiations, but were initially confronted with uncertainty over the ending date of the First Control Year, a prominent feature of the Wage Control program.

This was vital to the negotiations since pay increases could not be implemented under the labor agreement until the commencement of the Second Control Year. The final decision as to the ending date of the First Control Year was an exclusive determination of the Pay Board, an arm of the Economic Stabilization Program.

Prior to Pay Board action, the parties reached an agreement bearing the effective date of June 29, 1972. July 1, 1972 was agreed upon by the parties as the date for the end of the First Control Year. It was further agreed, again between the parties, that the wage settlement would be implemented as of July 3, 1972. These agreements between the parties were, of course, subject to Pay Board approval.

858

Despite this agreement of the parties, the Pay Board settled upon September 30, 1972 as the closing date of the First Control Year, thus delaying implementation of the wage settlement from July 3, 1972 until October 1, 1972. This also had the practical effect of delaying the later implementation of the wage portion of the negotiated agreement, scheduled to occur on each of the succeeding anniversary dates from the close of the First Control Year. The resulting delayed dates were from July 3, 1973 and 1974 to October 1, 1973 and 1974, respectively.

In August, 1973, Plaintiff here, National Mine Service Company, purchased all of the stock of Morgantown Machine & Hydraulics, Inc., and promptly liquidated that concern. During the spring of 1974, the Court is advised that all applicable restrictions under the Economic Stabilization Act of 1970, 12 U.S.C. § 1904, expired.

On April 9, 1974, defendant Union's representative notified Plaintiff in pertinent part as follows:

"It is my understanding that wages are no longer being controlled by the government in the type of industry such as Morgantown Machine and Hydraulics. Accordingly, *it is essential that the parties meet for the purpose of implementing the provisions of Article 31, Paragraphs 31.6 and 31.7 of the Agreement and to determine the company's compliance in order that the employees will receive the full value of the Wage Settlement contained in this Article.*"

"You are hereby requested to meet with the Union as soon as possible for the purpose of resolving this matter." (Plaintiffs Exhibit 2.)

On August 23, 1974 defendant Union's representative further corresponded with Plaintiff as follows:

"Pursuant to the provisions of Article 31, Paragraph 31.6 of the Agreement dated June 29, 1972, a dispute still exists between the parties in as much as the company has failed to implement the agreement to Wage Settlement of One Dollar and Twenty Five Cents ($1.25) per hour over a three (3) year period to become effective the date of the Agreement."

The communication further narrated that meetings had occurred and certain transactions had taken place between the parties, including the furnishing of various items of information to the Plaintiff and then advised:

"[t]o this date, your company has failed to implement the full value of the Wage Settlement."

"In view of the foregoing, the Union feels that the Company has had more than a fair amount of time to conclude its findings in this matter and to resolve the existing dispute. Under the circumstances, the Union has no recourse but to execute the procedure set forth in Article 31, paragraph 31.6, in the form and manner described in Article 37 of the Agreement."

"Accordingly, *you are hereby notified that sixty (60) days subsequent to receipt of this certified letter a strike will occur at both the Morgantown and Fairmont Plants unless this matter is resolved.*" (Plaintiffs Exhibit 4.)

On the day noticed for the strike, October 25, 1974, the Plaintiff commenced this action seeking a temporary restraining order to prevent the proposed work stoppage. Following extensive hearings on the matter, the parties agreed to advance the action to the preliminary injunction stage. It is in this posture that the action is now before the Court. As of this time the Court is not advised that a strike has actually occurred. Counsel for Defendant Union has urged the proper court atmosphere for the resolution of the issues of law presented.

It is the position of the Plaintiff that the dispute between the parties is basically one of compliance with the wage rates set forth in the contract and therefore subject to binding arbitration under the terms of the agreement. As the Plaintiff casts the issue it is whether the wage settlement arrived at is to include the value of fringe benefits or

whether it is to be limited solely to increases in money wages. The union contends that, notwithstanding the question of inclusion or exclusion of fringe benefits in arriving at the settlement figure, they wish to negotiate further the full value implementation of that settlement, basically from the standpoint of timeliness, and that as to a dispute of this nature, they have reserved the right to strike.

The agreement between the parties here contains a limited no strike clause:

## AGREEMENT AGAINST STRIKES OR LOCKOUTS

19.1. Except as provided elsewhere in this Agreement, the Company and the Union agree that there shall be no strikes or lockouts during the life of this Agreement, and disputes shall be settled in accordance with the peaceful machinery provided therefor in the contract.

There is also a grievance-arbitration provision which reads, in pertinent part, as follows:

## GRIEVANCE PROCEDURE
### Scope

20.1. This grievance procedure may be applied to any differences, disputes or complaints regarding the interpretation or application of this agreement, or regarding matters of wages, hours, and working conditions excluded from or not covered by this Agreement.

### Duties of Arbitrator

20.7. . . . [t]he subjects of wages (including incentives), are by this section excluded from arbitration, . . . except for questions or compliance with Article 31, Wages, of this Agreement.

The Plaintiff bases its contention of arbitrability on the language of these sections, maintaining that this "labor dispute" is one of "compliance with Article 31, Wages, of this Agreement."

The union advances its position with two later sections of the Agreement. The pertinent parts of Articles 31 and 37, upon which the Union relies are as follows:

## WAGES

31.1 The standard hourly wage scale rates based on job classifications and the effective dates thereof shall be set forth in Appendix "a" and shall become a part of this Agreement and shall be subject to Section 31.6 of this Article.

31.6 The Company and the Union have agreed on one dollar and twenty-five cents (1.25) per hour over a three year period to become effective the date of this Agreement as a basis for settlement of their current collective bargaining dispute. It is further understood that in all events the employees are to receive the full value of this settlement, including the then current equivalent worth of any item which is not or cannot be enjoyed at a time when it should be in effect under this Agreement. Accordingly, should the law, any executive order, or any ruling or decision of the Internal Revenue Service, Pay Board or other agency operate to delay or deny the implementation of any provision of this settlement, the parties agree, notwithstanding any other provision in the collective bargaining agreement, that after removal or substantial relaxation of restraints limiting wage and fringe benefit increases, either party may terminate this agreement by serving on the other a notice 60 days in advance of the desired termination date in the form and manner described in Article 37 of the Agreement.

## TERM OF AGREEMENT

37.1 This Agreement shall terminate sixty (60) days after either party shall give written notice of termination to the other party, but in any event shall not terminate earlier than 12:00 P.M.,

September 30, 1975, except that either party may terminate this Agreement after sixty (60) days written notice to the other party as is set forth in Article 10.1 and 31.6 of this agreement.

37.2 If either party gives such notice, it may include therein notice of its desire to negotiate for the purpose of modifications to this Agreement or negotiating a new agreement. If the parties are unable to reach such agreement by the end of sixty (60) days after the giving of such notice, either party may thereafter resort to strike or lockout as the case may be in support of its position.

The broad issue cast in this civil action is whether, under the terms of the labor contract involving the parties, the controversy concerning certain aspects of wages can be settled by negotiations, including the right to strike or lockout, as urged by the Defendants, or must be resolved solely through the arbitration and grievance procedures of the contract, as urged by the Plaintiff.

Litigation seeking injunctive relief in a labor dispute must be viewed at the outset against the "strict conformity" back drop of the Norris-LaGuardia Act, 29 U.S.C. §§ 101 to 115, and the subsequent decision of the United States Supreme Court in Boys Markets Inc. v. Retail Clerks Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). Before a court may grant injunctive relief in litigation involving a "labor dispute", ordering a halt to a work stoppage by employees, certain findings of fact are statutorily mandated as a condition to that court's jurisdiction.

Where the underlying dispute is one which the parties have not contractually bound themselves to arbitrate, the requisite findings are those set forth in section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107 (1970).[1] If, on the other hand, the parties have bound themselves by their agreement to submit the "labor dispute" to binding arbitration, a work stoppage based upon such a dispute apparently may be enjoined upon less stringent, more traditional equitable principals. The initial finding of fact which must be made under Boys Markets to maintain jurisdiction in such circumstances, of course, is that the parties are, in fact, bound by their agreement to submit the "labor dispute" to arbitration. The Court must first look to the agreement of the parties and determine, as an absolute condition to the granting of injunctive relief, that the "labor dispute" between the parties is covered by the arbitration-grievance procedures of the agreement. If the parties are not so bound, and if the requisites of 29 U.S.C. § 107 have not been met, the Court is without jurisdiction to enjoin the work stoppage. The expressions of Congress in the Norris-LaGuardia Act and of the United States Supreme Court in Boys Markets are clear in this regard.

This determination of arbitrability must be made from the terms of the agreement, for it is the agreement which represents the expressed intent of the parties. It is their expressed intent which circumscribes the limits of the grievance-arbitration procedure and thereby defines the parameters of the restraint imposed on the right to strike.

1. "No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, . . . except after findings of fact by the court, to the effect—

    (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, . . . ;

    (b) That substantial and irreparable injury to complainant's property will follow;

    (c) That as to each item of relief granted greater injury will be inflicted upon the complainant by the denial of relief than will be inflicted upon the defendants by the granting of relief;

    (d) That complainant has no adequate remedy at law; and

    (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

■ In examining the terms of the agreement, consideration must be given to the strong national policy favoring arbitration of labor disputes, a policy that manifests itself in the form of a presumption of arbitrability. Where a difference arises over the application of the arbitration clause, "[d]oubts should be resolved in favor of coverage." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). In the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail. Id., at 585, 80 S.Ct. 1347. There can be no doubt that this presumption of arbitrability is the proper standard to be applied to *Boys Markets* situations, especially in this Circuit.[2] Monongahela Power Co. v. Local 2332, International Brotherhood of Electrical Workers, 484 F.2d 1209 (4th Cir. 1973); Wilmington Shipping Co. v. International Longshoreman's Assn., (4th Cir. 1974); Armco Steel Corp. v. United Mine Workers of America, (4th Cir. 1974) 505 F.2d 1129.

■ The presumption is formidable but, as the language of *Warrior & Gulf, supra,* indicates it is not irrebuttable.

■ If the presumption of arbitrability in labor disputes was absolute or even substantially so then a legal presumption would compel parties to arbitrate "labor disputes" when they had not, in fact, agreed to do so. A basis would thus be formed for injunctive relief not contemplated by the Congress in the Norris-LaGuardia Act or by the Supreme Court in *Boys Markets*. Under the present state of the law no obligation to arbitrate a labor dispute arises solely by operation of law. The law compels the parties to a "labor dispute" to submit his grievance to arbitration only when he has contracted to do so. Gate-

way Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974). Where vague and ambiguous provisions are present in a labor agreement, forceful expressions of intent are required to exclude a dispute from arbitration. On the other hand, by implication at least, as this language of exclusion becomes more clear and specific, the presumption of arbitrability principal retreats accordingly.

■ The parties to a labor agreement can lawfully, and do, exclude certain issues from arbitration, and, in such cases, the reluctant party should not be compelled to submit a controversy to arbitration. A fair construction of the agreement can of course reflect an expressed "meeting of the minds" to be bound to arbitrate. Local 210, International Printing Pressmen and Assistants Union v. Times-World Corp., 381 F.Supp. 149 (W.D.Va.1974),

A fair construction of the contract here reveals that certain matters of compliance with the wage provisions of the agreement are subject to adjustment through arbitration. However, the later and more specific provisions of the agreement make it certain that if questions of implementation of the wage settlement arise in a particular context, then, notwithstanding any other provision in the collective bargaining agreement, the agreement may be terminated and negotiations resumed.

"Accordingly, should the . . ., Pay Board . . . operate to delay or deny the implementation of any provision of this settlement, the parties agree, *notwithstanding any other provision of the Collective Bargaining Agreement,* that after the removal or substantial relaxation of restraints limiting wage and fringe benefit increases, *either party may terminate this agreement* by serving on the other a notice sixty (60) days in advance of the

---

**2.** *But see* Standard Food Products Corp. v. Brandenburg, 436 F.2d 964 (2d Cir. 1970); *See generally* Note, Labor Injunctions, Boys Markets and the Presumption of Arbitrability, 85 Harv.L.Rev. 636 (1972).

desired termination date in the form and manner described in Article 37 of the Agreement." Article 31.6. (Emphasis supplied).

■ This right to terminate the agreement arises ". . . [*n*]*otwithstanding any other provision in the . . . agreement, . . .*" This phrase in proper context clearly and specifically conveys the expressed intent of the parties to exclude as to the "labor dispute" now before the Court, notwithstanding the earlier statements relating to the settlement of disputes through arbitration. This is the plain, clear, and unambiguous meaning of this agreement. Any other interpretation would lead the Court to the unacceptable conclusion that the language of Article 31.6 was placed in the contract for no purpose and that the rights reserved to the parties therein were intended to be valueless.

Further, Article 31.6 of the agreement is not a traditional exclusionary clause, removing certain matters from the coverage of the arbitration-grievance machinery. In its truest light, it is the recognition by the parties of a condition subsequent to the contract; namely, that upon the happening of a condition subsequent to the execution of the agreement, as occurred, the agreement may be renegotiated and, if needed, terminated by either or both of the parties.

In any event, whether section 31.6 is viewed as an exclusionary clause or as an express condition subsequent to the contract, it is clear that once the events contemplated by the language of that section have occurred either party may proceed to terminate the agreement.

■ The Pay Board's ruling as to the closing date for the First Control Year had the effect of delaying implementation of the wage package when measured against the timetable of dates agreed upon by the parties. The Pay Board restrictions have now been removed. The Union has served notice of its desire to negotiate, indeed the parties have had discussions to this end. The Union has noticed its intention to strike in support of its position. All of the expressed conditions precedent to the right to strike have been satisfied. The fact that there *may* be legitimate questions of compliance with the terms of Article 31 by Plaintiff, as urged, which could be settled through the grievance machinery, does not operate to deny the Union of its reserved right to strike when the circumstances giving rise to that right have occurred.[3]

The Court accordingly finds that under the terms of the contract there exists a "labor dispute" as to the full value implementation of the wage settlement of June 29, 1972, and that as to this "labor dispute" the Union has expressly reserved the right to strike in support of its position; that viewing Section 31.6 of the Agreement as a condition subsequent to the contract, that condition has been met; that this dispute is not one exclusively subject to the grievance—arbitration machinery of the contract; that the particular provisions

---

3. The question of "compliance" has been injected into this action by both parties. It is the Union's position that the one dollar and twenty-five cent pay hike agreed to by the parties in section 31.6 exceeded the 5.5% pay raise guideline in force under the Economic Stabilization Act of 1970, and that, because of the Economic Stabilization Program, only the allowable 5.5% increases have been given to the employees—ninety-seven cents in strictly money wages to date. The Company maintains that there has been no delay in the implementation of the called-for one dollar twenty-five cent per hour raise because, considering money wages and fringe benefits together, the employees are now receiving one dollar and forty-two cents per hour more than they were at the beginning of the contract period. The fact that the employees may be receiving that amount, of course, is not dispositive of the question of the timeliness of the wage package's implementation. In any event, to accept the Company's position would require the Court to believe that the Company granted wage increases which, by their size, may have been violative of the guidelines set by the Economic Stabilization Program. As the Court has noted, an interpretation of the meaning of the term "wages" is unnecessary here since other provisions of the contract clearly give the Union the right to strike under the present circumstances.

of the agreement here removes from this case the force of the presumption of arbitrability principle; that none of the requirements of 29 U.S.C. § 107 have been met; and, therefore, this Court is without jurisdiction to grant the preliminary injunction prayed for.

While secondary to the compelling issues presented and acted on, it should also be noted that the relief sought here is wholly prospective in nature. There has not been an actual work stoppage or strike at the Morgantown Division and nothing in the record indicates affirmatively that the notice of intent to strike was more than a threat designed to exert a form of pressure on the employer engaged in a highly competitive satellite business in the coal industry.

For the reasons above-stated, Plaintiff's prayer for a preliminary injunction is hereby denied. An order will enter accordingly.