MOHAWK RUBBER COMPANY,
Plaintiff,

v.

UNITED RUBBER, CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA, AFL–CIO, et al., Defendants.

No. C77–462A.

United States District Court,
N. D. Ohio, E. D.

Jan. 10, 1978.
On Motion for Reconsideration
Jan. 20, 1978.

Robert S. Carabell, Norman S. Carr, Akron, Ohio, for plaintiff.

Harley M. Kastner, Charles R. Armstrong, Akron, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Plaintiff Mohawk Rubber Company instituted this action for injunctive relief in an effort to prevent an impending strike at its Akron, Ohio plant. The Court duly heard testimony and received exhibits on December 15, 1977. The following shall constitute

the Court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

Plaintiff filed this action on December 7, 1977, naming the International Union, United Rubber, Cork, Linoleum and Plastic Workers of America AFL–CIO and Local Number 6 of said union as defendants. Also named defendants, in both their individual and official capacities, were various officers of the local union.

At the time of filing its complaint herein, plaintiff sought a temporary restraining order. After a hearing on said motion on December 8, 1977, the Court in its Order thereof, temporarily restrained defendants from engaging in a threatened work stoppage. By stipulation of the parties, the hearing on plaintiff's motion for a preliminary injunction was consolidated with the trial on the merits held on December 15, 1977.

It should be noted that although plaintiff contends that the underlying dispute between the parties is arbitrable, it has not requested the Court to order the union to submit said dispute to arbitration, rather the sole relief requested is the enjoining of the impending strike.

This Court's jurisdiction is premised upon Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, which provides that a district court shall have jurisdiction to enforce contracts between employers and labor organizations. Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, however, provides:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

a) Ceasing or refusing to perform any work or to remain in any relation of employment.

In *Boys Markets v. Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court accommodated the conflicting language of Labor Management Relations Act and the Norris-LaGuardia Act. In so doing the Court carved a narrow exception to the Norris-LaGuardia Act's seemingly absolute prohibition of injunctive relief against strikes. In *Boys Markets* the Court held that a district court could enjoin a strike in violation of a no strike clause if the underlying dispute was arbitrable under the terms of the collective bargaining agreement between the parties.

In *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974), the Court expanded the *Boys Markets* decision by holding that even in the absence of an express no-strike clause, a strike over an issue which the parties were contractually bound to arbitrate could be enjoined based upon an implied no-strike clause. The implied no-strike clause arises from the existence of a mandatory arbitration clause, however, the Court further stated:

[A]n arbitration agreement is usually linked with a concurrent no-strike obligation, but the two issues remain analytically distinct. Ultimately, each depends on the intent of the contracting parties. It would be unusual, but certainly permissible, for the parties to agree to a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation. Such a contract would reinstate the situation commonly existing before our decision in *Boys Markets*. Absent an explicit expression of such an intention, however, the agreement to arbitrate and the duty not to strike should be construed as having coterminous application.

*Gateway Coal Co., supra* at 382, 94 S.Ct. at 639.

In *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Supreme Court refused to further expand the *Boys Markets* holding to allow for an injunction where there was not an underlying arbitrable issue even though there was an express no-strike clause: "The allegation of the com-

plaint that the Union was breaching its obligation not to strike did not in itself warrant an injunction." *Buffalo Forge Co., supra* at 409, 96 S.Ct. at 3148.

■ This line of cases, therefore, dictates that before this Court can issue the injunction which plaintiff seeks, it must affirmatively answer three questions. First, did the agreements between the parties impose on them a duty to arbitrate the underlying dispute? Second, if so, did the agreements between the parties, expressly or implicitly, contain a no-strike obligation supporting the issuance of a *Boys Markets* injunction? Third, do the circumstances of this case satisfy the traditional equitable considerations controlling the availability of injunctive relief? See *Gateway Coal Co., supra* 414 U.S. at 374, 94 S.Ct. at 635. The resolution of these issues requires the examination of a number of agreements entered into between the parties at different times as well as analysis of how said agreements effect one another.

The employees at plaintiff's Akron, Ohio plant are represented, for collective bargaining purposes, by the defendant local union. In 1973 plaintiff and the local union entered into a collective bargaining agreement which, by its terms, would continue in effect for three years and, thereafter, would renew itself for yearly periods unless either party, by written notice, informed the other of a desire to terminate or amend said agreement. The parties also, on June 19, 1973, entered into a separate "Pension, Hospitalization, Insurance and Service Award Agreement" (hereinafter referred to as Pension Agreement). The 1973 Pension Agreement provided that its terms could be opened for renegotiation by the giving of notice by either party not more than 75 nor less than 60 days prior to June 19, 1976.

June 19, 1976 was apparently the date on which collective bargaining agreements could be terminated and pension plans opened for negotiation throughout the rubber industry.

Sometime prior to June 19, 1976, defendants notified plaintiff that they wished to terminate the 1973 collective bargaining agreement and renegotiate the terms of the pension plan. Similar notifications were apparently given by the unions representing employees at the "Big Four" rubber companies, Firestone, Goodyear, Goodrich, and Uniroyal. Termination of the collective bargaining agreements at the "Big Four" companies led to strikes by their respective employees. Plaintiff's employees, however, continued to work on a day to day basis, extending the 1973 Collective Bargaining Agreement while they attempted to negotiate a new agreement.

On July 9, 1976, a Memorandum of Agreement was signed by representatives of the plaintiff and Local Union Number 6. Said memorandum recited that the union agreed to continue working on a day to day basis and to enter into a new collective bargaining agreement after the negotiations between the International Union and the "Big Four" companies were complete. This agreement was subsequently ratified by the membership of the local union.

The July 9, 1976 memorandum provided in part as follows:

> The Mohawk Rubber Company of Akron, Ohio and URW Local Union # 6 hereby agree that the attached amendments and interpretations shall be effective during the interim extension of the Collective Bargaining, Pension, Insurance and S.U.B. Agreements . . . .

Said agreement then recited the parties' agreement on the inclusion in the new collective bargaining agreement of particular matters.

For the most part, the memorandum recited an agreement to adopt whatever agreement was finally negotiated between the International Union and one of the "Big Four" companies. The parties agreed to incorporate whatever wage settlement was finally negotiated for the employees of Firestone Tire and Rubber Company. They agreed to whatever improvements and changes were negotiated for the employees of Goodyear Tire and Rubber Company in the area of Hospitalization and Insurance Benefits.

The parties deviated from this course of total incorporation, however, in the area of the pension plan:

The Company and Union agree, should Firestone Akron increase its Pension Benefit by any amount of dollars, the Company will increase its Pension, Service and Addendum Agreement by the same identical amount. Should existing fringes such as special age (65) benefits, etc.; be increased by Firestone Akron, Mohawk will make identical increases. Should Firestone Akron make improvements in the pension area which are already in existence in the Mohawk contract, the Company will calculate these costs based upon its employees in Local # 6 on 6–19–76 and negotiate where in the Pension Agreement that added cost shall be applied. The Company shall be given a reasonable amount of time to actuarially calculate the cost involved. In no event shall the Company be required or expected to set a new precedent or benefit not now in existence at Firestone Akron. Any additional benefits shall become effective September 1, 1976, 1977, and 1978. In lieu of a later settlement all benefits and fringes will be retroactive to September 1, 1976.

Finally, the July 9, memorandum closed with the following four paragraphs:

The URW Local Union # 6 agree upon the Company's acceptance of the conditions above to continue to work on a day to day basis until a final settlement can be reached.

The Company agrees that failure to comply with any of the aforesaid agreements or issues the Local Union # 6 upon proper written notice in seventy-two (72) hours have the right to strike the plant. The Company agrees that URW Local # 6 has served all proper notices required by law and no further notices will be necessary to terminate the aforesaid Agreements except as follows:

The Local Union agrees to give the Mohawk Rubber Company at least a seventy-two (72) hour written notice to terminate the aforementioned Agreements if

the tentative settlement is rejected by the membership.

After ratification of the July 9, memorandum, plaintiff's employees continued to work on a day to day basis. The "Big Four" rubber companies and the International Union arrived at new collective bargaining agreements some time in August 1976. Thereafter, by making reference to the pertinent portions of the "Big Four's" agreements, a new collective bargaining agreement was prepared and signed by plaintiff and the local union. Said signing occurred on September 30, 1976.

Among other things, the 1976 Collective Bargaining Agreement provides, as the 1973 agreement had, for arbitration of grievances "under the terms of this agreement." Said agreement further provides:

(c) Since adequate provisions are hereby provided for the handling of grievances, there shall be no slowdown, sitdown, stoppage of work, strike or lockout over any matters subject to the grievance procedure, including arbitration.

The 1976 Collective Bargaining Agreement further recited that the parties entered into a pension agreement which "is now separate and apart from the Collective Bargaining Agreement."

Plaintiff began giving increased benefits under the pension plan on September 1, 1976. Some time thereafter, plaintiff's attorneys began preparing a draft of the Pension Agreement. A copy of said draft was delivered to the local union in April 1977. At that time a dispute arose over its terms.

The pension plan finally agreed to by the Firestone Tire and Rubber Company and its employees, contained the following language:

13. In the event of the complete and permanent closure of a local plant covered by the Agreement: .

(i) An employee who then has 30 or more years credited service but shall not have attained age 55 shall not be eligible for a deferred vested pension but shall instead be eligible for immediate pension (the provisions of

Paragraph 5 of Article IV notwithstanding). The amount of such immediate pension shall be determined in accordance with Paragraph 1 of Article V and based on his then credited service.

The draft of the Pension Agreement prepared by plaintiff's attorneys, however, did not contain such a provision. The local union asserts that the July 9, 1976 Memorandum dictates that said provision is part of the plan, whereas, plaintiff argues that this is a new benefit at Firestone and that, therefore, the Memorandum excludes said provision.

The parties discussed this underlying dispute for a number of months but were unable to resolve it. As a result, the draft of the 1976 Pension Agreement remains unsigned.

In November 1977, the local union filed a grievance, demanding that plaintiff submit the dispute to arbitration. Subsequently, however, the union withdrew its grievance and, on December 5, 1977, notified plaintiff that a strike was being called.

Paragraph II(4) of the 1973 Pension Agreement provided as follows:

If any dispute or difference, other than a dispute referred to in Paragraph 5 of this Article II, arises between any Employer or the Pension Board and any Employee who is an applicant for a pension or other benefit or any Pensioner, as to eligibility for, or amount of payment of, any pension or other benefit provided under the Plan, such dispute or difference if such Employee or Pensioner is represented by a Collective Bargaining Representative, may be taken up as a grievance procedure provided for in the applicable Collective Bargaining Agreement, beginning with the step at which a grievance is presented to the Personnel Manager. If any dispute or difference is appealed in accordance with this Paragraph 4 to any arbitrator or umpire, he shall have the authority only to interpret and apply the provisions of the Plan insofar as shall be necessary to the determination of such dispute or difference, but he shall not

have authority in any way to alter, add to or subtract from any of such provisions; and his decision on any dispute or difference which has properly been referred to him shall be binding upon all interested parties. The fees and expenses of such arbitrator or umpire shall be shared equally by the Employer and the local union representing such Employee or Pensioner.

Paragraph II(5) of the draft of the 1976 Pension Agreement contains the same provision.

Plaintiff filed this action contending that the above language requires the dispute to be submitted to the arbitration process provided by the Collective Bargaining Agreement and that, therefore, the threatened strike would be in violation of the previously quoted no-strike clause. The union contends that the underlying dispute is not arbitrable and that the July 9, 1976 Memorandum of Agreement guarantees defendants the right to strike over the underlying dispute.

At the close of plaintiff's case, the Court granted the motion of the International Union to dismiss it as a defendant, based upon plaintiff's failure to present any evidence as to it.

## DISCUSSION

As stated at the outset, before this Court can issue the requested injunction it must affirmatively respond to three questions. The first of these three questions is whether the dispute between the parties is over an arbitrable issue. The Court has concluded that it is.

The underlying issue in the present case is whether the parties agreed that the so called "plant closure clause" would be included in the 1976 Pension Agreement. To determine whether this is an arbitrable issue it is necessary to examine the agreements between the parties.

As found previously, both the 1973 Pension Agreement and the draft of the 1976 Pension Agreement contain a clause incorporating the Collective Bargaining

Agreement's arbitration clause. The union, however, contends that neither the arbitration clause of the 1973 Pension Agreement nor that of the draft of the 1976 Pension Agreement is now in effect. The Court concurs in the conclusion that the arbitration clause contained in the draft of the 1976 Agreement is ineffective. The unsigned draft is plaintiff's attempt to reduce the current Agreement to writing, however, until signed it cannot be said to bind defendants to arbitration.

The conclusion that the draft which plaintiff prepared is not a current Pension Agreement, however, does not lead to the conclusion that there is no current Pension Agreement. As found earlier, the 1976 Collective Bargaining Agreement recites that the parties entered into a new Pension Agreement. The Court concludes that this was accomplished with the signing of the July 9, 1976 Memorandum of Agreement. The terms of the new Pension Agreement are the terms of the 1973 Pension Agreement, as amended by the July 9th Memorandum. The July 9th Memorandum did not amend the 1973 Pension Agreement's arbitration clause, therefore, it is still in effect.

■ Defendants argue that even if the arbitration clause as contained in the 1973 Pension Agreement is still viable, the present issue does not fall within it for two reasons. The first reason given by defendants is the scope of the arbitrator's authority.

As found previously, the Pension Agreement's arbitration clause provides that the arbitrator "shall have the authority only to interpret and apply the provisions of the Plan insofar as shall be necessary to the determination of such dispute or difference, but he shall not have authority in any way to alter, add to or subtract from any of such provisions. . . ." Defendants assert that under the quoted language, the arbitrator would be without power to add the plant closure language to the 1976 Pension Agreement. This assertion is true, if the parties did not agree to the plant closure clause in their July 9th Memorandum. If,

however, as the union asserts, said clause was agreed to, it is already a part of the Pension Agreement. In determining whether the language of the Memorandum of Agreement amended the Pension Agreement to include the plant closure clause, the arbitrator will not be called upon to add to the Pension Agreement, rather he will be called upon to interpret the parties' agreement to determine what the provisions of the present Pension Agreement are. He will be called upon to interpret the language of the Pension Agreement, which is now found in the 1973 Pension Agreement and the July 9, 1976 Memorandum of Agreement, to determine whether the draft of the 1976 Pension Agreement prepared by plaintiff accurately reflects the contents of the Pension Agreement. If he should determine that the parties agreed to the plant closure clause, it is already a part of the agreement and he would have authority to so rule.

■ The union's second reason for concluding that the present issue does not fall within the arbitration clause is that there is no one who is eligible to file a grievance. The Pension Agreement's arbitration clause provides:

> If any dispute or difference . . . arises between any employer . . and any employee who is an applicant for a pension or other benefit, or any pensioner . . . may be taken up as a grievance procedure provided for in the applicable collective bargaining agreement . . .

The union asserts that no employee could claim a pension under the plant closure clause unless and until the plant were closed. There is no doubt, however, that the inclusion of the plant closure clause in the Pension Agreement would be a "benefit" to plaintiff's employees. Considered as such, the present dispute over whether said clause is included in the Pension Agreement is arguably within the arbitration clause. In *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960), the Supreme Court stated:

Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

The Court is aware that, as has been pointed out by defendants, the Supreme Court was dealing with an arbitration clause in a different context in *Steelworkers v. Warrior & Gulf Co.* In that case plaintiff was seeking an order compelling arbitration rather than attempting to obtain an injunction against a threatened strike. The Court feels, however, that the same policies which supported a broad reading of the arbitration clause involved in that case support a broad reading in a case where an injunction is the only relief sought.

Based on the foregoing, therefore, the Court concludes that the first question posed by this action can be answered in the affirmative. The threatened strike is over an issue which the parties have agreed to arbitrate.

■ Having resolved the first question in the affirmative, it is necessary to determine whether the agreements between the parties, expressly or implicitly, contain a no-strike obligation supporting the issuance of a *Boys Markets* injunction. The Court has concluded that the defendants are not contractually bound to refrain from engaging in a strike while the present underlying dispute is submitted to arbitration.

■ Normally a no-strike clause is the union's *quid pro quo* for the employer's agreement to submit issues to binding arbitration. In fact, in the absence of an express no-strike clause in a contract containing a mandatory arbitration procedure, a no-strike clause will be inferred. *Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). This does not mean, however, that in every case there will be a no-strike clause which is co-extensive with the arbitration clause.

[A]n arbitration agreement is usually linked with a concurrent no-strike obligation, but the two issues remain analytically distinct. Ultimately, each depends on the intent of the contracting parties. It would be unusual, but certainly permissible, for the parties to agree to a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation. Such a contract would reinstate the situation commonly existing before [the] decision in *Boys Markets.* Absent an explicit expression of such an intention, however, the agreement to arbitrate and the duty not to strike should be construed as having coterminous application.

*Gateway Coal Co., supra* at 382, 94 S.Ct. at 639. The Court has concluded that the facts of the present case present the unusual situation where a contract's arbitration clause and its no-strike clause are not coterminous and further, that the present underlying dispute between the parties, while covered by the arbitration clause, is not within the no-strike clause.

There is no doubt that the no-strike clause contained in both the 1973 and 1976 Collective Bargaining Agreements is coterminous with the arbitration clause contained in said Agreements. This means not only did the no-strike clause cover all arbitrable issues, but also that it did not cover any issues which were not arbitrable.

■ When the parties entered into the July 9, 1976 Memorandum of Agreement, they chose to include the following clause:

The Company agrees that failure to comply with any of the aforesaid agreements or issues the Local Union # 6 upon proper written notice in seventy-two (72) hours have the right to strike the plant.

The Court is faced with determining what effect the parties intended this clause to have.

At the outset, it is clear that this clause was intended to give the union the right to strike over issues which it otherwise would not have a right to strike over. Otherwise the clause would be a nullity.

This leads to the conclusion that the "strike clause" was intended to give the union the right to strike over certain arbitrable issues. A "strike clause" would have been unnecessary to allow strikes over non-arbitrable issues because the union already had a right to strike over nonarbitrable issues.

■ The only issue which remains is whether the strike clause covers the present arbitrable issue. As found earlier, with the signing of the Memorandum of Agreement the parties entered into a new Pension Agreement. It is clear, however, that both parties contemplated that sometime after the "Big Four" companies reached agreements with the International Union, plaintiff would reduce the terms of the new Pension Agreement to writing for signature of the parties. The strike clause begins: "The Company agrees that failure to comply with any of the aforesaid agreements . . . ." The Court concludes that this language was intended to mean that if when plaintiff reduced the parties' agreement to writing, it failed to include any of the agreed upon clauses, the "strike clause" would allow a strike.

Plaintiff, in effect, has conceded in its Brief that the "strike clause" was intended to cover situations where plaintiff refused to include agreed upon clauses when it reduced the Pension Agreement to writing:

Given the realities as evidenced by the parties conduct, Mohawk's interpretation of the "strike clause" makes much greater sense than the Union's. That interpretation is that, if, when the Big Four settled and Mohawk "welched", the Union had the right to strike. By "welching" it is meant that Mohawk would refuse to implement the benefits agreed upon which are spelled out in the Memorandum. For example, upon Goodyear settling its negotiations, if Mohawk would "welch" by saying we cannot af-

ford Goodyear's hospitalization and insurance plan, then the Union would have the right to strike.

The plaintiff appears to be arguing, however, that the "strike clause" was only meant to cover clear cases of refusal to include agreed upon benefits. The question of whether Mohawk would have indeed been reneging on its Agreement by not incorporating Goodyear's hospitalization and insurance plan, however, would be just as clearly an issue for the arbitrator as the present dispute over whether plaintiff reneged by not including Firestone's plant closure clause. The difference plaintiff perceives is one of degree, not kind. In effect, plaintiff is asking the Court to look at the merits of the underlying dispute to determine whether it has lived up to its agreement. The parties' contract does not call for a judicial determination of what is or is not included in the Pension Agreement, however, it calls for an arbitrator's determination.

The Court is cognizant of the fact that without the requested injunction, the parties' obligation to arbitrate is of little meaning. As the Supreme Court stated in *Gateway Coal, supra* at 382, 94 S.Ct. at 639: "Such a contract would reinstate the situation commonly existing before [the] decision in *Boys Markets.*" Based on the agreements between the parties, however, the Court can reach no other conclusion but that the parties intended that if a dispute arose at the point where their agreements were being reduced to writing, even though said dispute was arbitrable, the union could, upon seventy-two hour notice, strike plaintiff's plant.

Having reached a negative conclusion on the second question presented by this case, it is unnecessary for the Court to consider the third.

Based on the foregoing, therefore, judgment shall be entered in favor of the defendants and against plaintiff. The temporary restraining order previously entered in this case is hereby dissolved.

IT IS SO ORDERED.

## ORDER

## ON MOTION FOR RECONSIDERATION

Plaintiff Mohawk Rubber instituted this action in an effort to enjoin an impending strike at its Akron, Ohio plant. It alleged that the threatened strike was over an arbitrable dispute and in violation of a contractual no-strike clause. In its Memorandum Opinion and Order of January 10, 1978, this Court found that the underlying dispute was arbitrable, but that the agreements between the parties preserved the defendants' right to strike in the present case. This action is now before the Court on plaintiff's motion for reconsideration. Upon consideration and for the reasons stated below, the Court declines to disturb its previous Order.

The Court's conclusion that the dispute between the parties was not covered by a contractual no-strike clause was based upon a clause contained in a July 9, 1976 Memorandum of Agreement between the parties. Said clause was as follows:

> The Company agrees that failure to comply with any of the aforesaid agreements or issues the Local Union # 6 upon proper written notice in seventy-two (72) hours have the right to strike the plant.

The Court found that in the absence of the above quoted clause, the no-strike clause contained in the parties' collective bargaining agreement would have been coterminous with the arbitration clause found in the same agreement. It further found, however, that the above quoted clause removed the present underlying dispute from the coverage of the no-strike clause.

Plaintiff's present motion asserts that this finding was erroneous for a number of reasons. The Court will consider said reasons separately.

■ Plaintiff's first ground for its assertion that the Court's finding was erroneous is based upon its reading of the clause in question. It asserts that the clause should be read as meaning that the defendants would have the right to strike only after an arbitrator had determined the underlying dispute in defendants' favor. The Court, however, is unable to adopt this reading for two reasons.

The first reason the Court is unable to adopt this reading is based on testimony presented at trial. There was testimony that the clause in question was included in the Memorandum of Agreement as a result of a problem which had arisen at the time the 1973 Collective Bargaining Agreement had been entered.

In 1973 a Memorandum of Agreement similar to the one here involved was entered into. When the parties attempted to reduce their agreement to writing, in the form of a new collective bargaining agreement, a dispute similar to the present underlying dispute arose. At that time the defendants felt that they did not have the right to strike over said dispute. When the July 19, 1976 Memorandum of Agreement was prepared, in order to avoid a situation similar to that which occurred in 1973, defendants proposed the clause here in question. This indicates that the "strike clause" was intended to cover the very situation now before the Court.

The second reason the Court cannot adopt the reading of the clause urged by plaintiff is that it would attribute an intention to the parties which the Court does not feel is justified. Plaintiff's reading would mean that the parties intended to preserve defendants' right to strike when there would be no practical reason for striking. If the underlying dispute were decided in defendants' favor by an arbitrator, said decision could be enforced by court order. This Court is unwilling to conclude that defendants wished to preserve the right to conduct a strike when they could enforce the arbitrator's decision by court order. Such an order would not involve the undesirable effects for the union's membership which a strike does.

■ The plaintiff's second argument is based on the rule of contract construction that language in a contract will be interpreted most strongly against the party using it. The Court has determined, however, that this rule of construction can not be resorted to in the present situation.

"This rule is most often applied in insurance cases or other cases involving contracts of adhesion." *Ridgway Hatcheries, Inc. v. United States of America,* 278 F.Supp. 441 (N.D.Ohio 1968). It is clear that the present case does not involve a contract of adhesion. Further, the urged rule of construction is applied when there are two possible interpretations for a given clause. The Court is convinced that the present case presents only one possible interpretation. The clause in question must either be interpreted as the Court did in its original Order, or as being meaningless. "It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract . . . without force and effect.'" *Ralph Hochman & Company v. Fort Stanwix Mfg. Co.,* 284 F.Supp. 995 (N.D.N.Y.1967), quoting, *Corhill Corporation v. S. D. Plants, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37 (1961).

Plaintiff's final assertion is that the clause in question is vague and therefore, less than "explicit" within the meaning of *Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). The Court having concluded that there is only one meaning which it can attach to the clause in question, concludes that it is explicit within the meaning of *Gateway.*

Accordingly, the Court declines to disturb its previous Order.

IT IS SO ORDERED.